[Crim. No. 16344. In Bank. Feb. 4, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
LEANDRO A. SEDENO, Defendant and Appellant.

■■■■■■■

## COUNSEL

Gary M. Merritt for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby, Chief Assistant Attorney General, William E. James, Assistant Attorney General, Edward P. O'Brien, Eric Collins and Nancy S. Reller, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WRIGHT, C. J.**—A jury found defendant guilty of the first degree murder (Pen. Code, §§ 187, 189) of Officer Richard Klass and the attempted murder (Pen. Code, §§ 664, 187) of Officer James Van Pelt. The court fixed the punishment for the murder at life imprisonment. In this appeal defendant contends that the evidence is insufficient to sustain the verdict of first degree murder and that the trial court gave erroneous and incomplete instructions. For reasons discussed below we conclude that the judgment must be reversed.

On the morning of May 6, 1966, defendant was a prisoner in the Daly City jail, having been held there overnight following his arrest on a misdemeanor charge. Shortly after 6 a.m., Officer Van Pelt, accompanied by another officer of the Daly City Police Department, took the only other prisoner then in the jail from his cell for photographing and fingerprinting. When they returned, and while the second officer was securing that prisoner, Officer Van Pelt removed defendant from his cell in order to take him to the squad room for the same "processing." On the way, defendant, who was walking in his stocking feet ahead of Officer Van Pelt, leaned over to pick up a pair of boots. When the officer instructed him to leave the boots, defendant straightened up and hit the officer in the jaw with his elbow, knocking the officer backward into a wall. Defendant then ran out of the building.

■■■■■

Officer Van Pelt called to another officer and pursued defendant, whom he quickly spotted nearby reaching down as if to put on a shoe. When the officer attempted to seize defendant, however, defendant struck him in the face and chest, using his fists with sufficient force to cause bruises and a swollen jaw. The officer thereupon threw defendant against a fence and struck him on top of the head with his baton. He again attempted to seize defendant, but when he turned his head momentarily as two more officers ran out, defendant broke away and ran toward Mission Street, a major thoroughfare linking Daly City and San Francisco.

Officer Van Pelt pursued defendant onto Mission Street on foot, stopping to telephone the station from a coffee shop to alert other officers. As he finished the call and returned to Mission Street, Officer Klass drove by in a black and white police car. Officer Van Pelt joined Officer Klass in the car and the pursuit continued. The two officers stopped again to pick up a third officer and then sighted defendant who was still running. They pulled the car across the sidewalk at a service station and all three officers, who were in uniform, emerged. The third officer, Sergeant Thomas Culley, told defendant to give up and he would not be hurt, but defendant, after shaking his finger at Officer Klass and mumbling in a low tone, ran around Officer Klass and continued down Mission Street.

Officer Van Pelt returned to the car. As he was doing so he saw Officer Klass tackle defendant from behind at the shoulders. He saw the two men fall between two parked cars where they were out of his vision, and he ran toward them. When Officer Van Pelt was still about 40 feet away he saw the pair emerge from between the parked cars. Officer Klass lay on his right side on the pavement with defendant lying behind and facing toward Officer Klass. Up to the time Officer Klass and defendant had disappeared from view between the parked cars, none of the officers had drawn his gun. When defendant and Officer Klass reappeared, however, defendant was holding with both hands the Smith & Wesson .357 Magnum revolver belonging to Officer Klass. Officer Van Pelt saw defendant, who was only 12 inches from Officer Klass, point the gun toward Officer Klass' back and fire. Officer Van Pelt then grasped defendant who turned and pointed the gun at Van Pelt's head. As Officer Van Pelt pushed the gun away, a shot was fired which caused powder burns on the officer's hand. Although the officer grabbed defendant's hands and defendant's finger was on the trigger, the officer did not put his hands over defendant's trigger finger and did not cause the gun to fire.

Unable to wrest the gun from defendant, Officer Van Pelt held it down on the ground until Sergeant Culley arrived and pried it from defendant's hand. Defendant continued to resist until several people restrained him.

Immediately after his arrest defendant was treated at the jail for a superficial scalp laceration caused by the blow from Officer Van Pelt's baton. The doctor who treated him found him to be active, alert, and behaving normally. Dr. Walter Rapaport, a psychiatrist, who examined defendant at approximately 10 a.m. on May 6, 1966, at the request of the district attorney or the police, found no evidence of mental illness at that time although he was aware that petitioner had a history of schizophrenia. His examination of defendant disclosed no distorted thinking and no psychiatric delusions or hallucinations. In the opinion of Dr. Rapaport, defendant was capable of premeditation and deliberation and of harboring malice. The doctor found no evidence that defendant had been rendered unconscious as a result of the blow and did not believe that defendant's behavior was the result of the blow on the head.

Officer Klass died on June 9, 1966, from causes directly related to the injuries he suffered in the shooting. Defendant was charged on July 19, 1966, with murder and attempted murder, but on August 19, 1966, after undergoing psychiatric examination pursuant to Penal Code sections 1367-1368, was found to be presently insane. Criminal proceedings were suspended and defendant was committed to the Atascadero State Hospital. He was subsequently returned to court but was again found to be insane and was committed a second time on April 6, 1967. Criminal proceedings were reinstated on October 1, 1969, when the court found defendant to be competent to stand trial.

### 1. Sufficiency of the Evidence.

Defendant contends that the evidence is insufficient to establish murder of the first degree in that there is no substantial evidence upon which to base a conclusion that the killing was deliberate.[1]

Defendant does not dispute that the jury was properly instructed as to the elements of first degree murder.[2]

---

[1] Penal Code section 189 provides with respect to the degrees of murder: "All murder which is perpetrated by means of a bomb, poison, lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree."

[2] All references to "CALJIC" herein are to California Jury Instructions—Criminal (rev. ed. 1958). The abbreviation "Supp." in parentheses following any instruction indicates that reference is made to the 1967 pocket supplement to that work. The abbreviation "ltr. supp." in parentheses following any instruction indicates that reference is made to a revision or new instruction issued by letter subsequent to publica-

"An appellate court must view the evidence in the light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People* v. *Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649].) The test is not whether a contrary conclusion might have been reached nor whether the reviewing court believes guilt has been established beyond a reasonable doubt, but whether substantial evidence supports the conclusion of the jury that the prosecution had met its burden of establishing guilt beyond a reasonable doubt. (*Id.*)

 Here the evidence and reasonable inferences drawn therefrom would support a conclusion that defendant deliberated his act before shooting Officer Klass. He had been stopped by police officers while fleeing from the jail. He had been advised to surrender and had been assured that he would not be hurt. He nonetheless attempted to continue his flight and when restrained by Officer Klass seized the officer's gun and, while the officer was lying on the ground with his back to defendant, shot the officer in the back. He had then attempted to shoot the second officer who sought to restrain him and had continued violently to resist capture.

tion of the 1967 pocket supplement and prior to publication of the 1970 third revised edition which was not yet available at the time of trial.

The following instructions were given:

CALJIC No. 303: "All murder which is perpetrated by any kind of wilful, deliberate and premeditated killing with malice aforethought is murder of the first degree.

"The word 'deliberate' means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word 'premeditate' means thought over beforehand.

"If you find that the killing was preceded and accompanied by a clear, deliberate intent to take life; an intent on the part of the defendant to kill, which must be the result of deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition, such as precludes the idea of deliberation, it is murder of the first degree.

"The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly deliberate and premeditated. The time will vary with different individuals and under varying circumstances. The true test is not the duration of time, but rather the extent of the reflection. A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it include an intent to kill, is not such deliberation and premeditation as will fix an unlawful killing as murder of the first degree. To constitute a deliberate and premeditated killing, the slayer must weigh and consider the question of killing and the reasons for and against such a choice and, having in mind the consequences, decide to and commit the unlawful act causing death."

CALJIC No. 303-A (Supp.): "Before you may find the defendant guilty of wilful, deliberate and premeditated murder of the first degree, you must determine that at the time the crime allegedly was committed he not only had sufficient mental capacity to form the specific intent to kill but also had sufficient mental capacity to maturely and meaningfully deliberate, premeditate and reflect upon the gravity of his contemplated act and to harbor malice aforethought."

As in *People* v. *Robillard* (1960) 55 Cal.2d 88 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086], the circumstances of the killing of Officer Klass afford a sufficient basis upon which the jury could infer that the killing was not a rash, impulsive act, and that defendant had in the course of his flight from jail weighed in his mind the possibility that the pursuing officers would apprehend him, and after having considered the reasons for and against such action, decided to resist capture and to kill if necessary. (Cf. *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942].)

██ The length of time during which an intent to kill is pondered may vary with the individual and the circumstances. The test is the ability of the defendant to maturely and meaningfully contemplate the gravity of his intended act. (*People* v. *Risenhoover* (1968) 70 Cal.2d 39, 52 [73 Cal. Rptr. 533, 447 P.2d 925]; *People* v. *Wolff* (1964) 61 Cal.2d 795, 821 [40 Cal.Rptr. 271, 394 P.2d 959]; *People* v. *Thomas* (1945) 25 Cal.2d 880, 900 [156 P.2d 7]; *People* v. *Sanchez* (1864) 24 Cal. 17, 30.) ██ There was substantial evidence here upon which the jury could find that defendant was able to and did kill deliberately.

### 2. *Instructions.*

Defendant took the stand in his own defense and testified to a history of mental illness, diagnosed as paranoid schizophrenia, which had resulted in several periods of institutionalization. At the time of the shooting he was on an indefinite leave from a veteran's hospital and had discontinued the use of his prescribed medications for approximately a week.

Dr. Charles Respini, a psychiatrist called as a defense witness, had examined defendant in August 1966 and found him to be acutely psychotic and incompetent to stand trial at that time. In his opinion defendant had been sane at the time of the killing, and had the capacity to intend to kill, but his judgment was diminished in that he was overly suspicious and overreacted when he felt threatened. Dr. Respini did not believe defendant was capable of acting with malice.

Defendant testified that he was able to remember at least 95 percent of the events surrounding the shooting of Officers Klass and Van Pelt. He testified that when Officer Van Pelt took him from the cell, the officer pushed him and he "lost control." Rather than assaulting the officer he decided to "retreat" by fleeing. He denied hitting the officer and stated that he had been hit twice on the head with the baton and was bleeding when he panicked and again ran away. He feared that the officers would beat him again.

Defendant testified that he had been handcuffed immediately upon being tackled and that "a few" officers then kicked him "all over" his left side while one held his hands. Then someone choked him while his legs were held. When his neck was released, defendant lifted his head and saw an officer squatting in front of him facing away. Defendant stated that he grabbed the officer's gun from the holster, fired a shot into the air, and then attempted to drop the weapon but was unable to shake it loose. At this point Officer Van Pelt grabbed his hands and turned them, causing him to trigger the gun and accidentally fire it. Defendant, who claimed to be able to recall accurately the order of events, testified that the second shot which had been accidentally fired was the shot that struck Officer Klass. He denied having an intent to shoot Officer Klass. He stated that he took the gun in a "reflex action" because he was being choked, but then realized that he was doing wrong and therefore fired into the air rather than at the officer.

The theory of the defense suggested by the evidence and expressed by counsel in his opening statement, was that defendant was so mentally ill as to be unable to premeditate or harbor malice, and that the shot which resulted in the death of Officer Klass was fired accidentally.

The court instructed the jury fully on first and second degree murder,[3]

---

[3]In addition to giving CALJIC Nos. 303 and 303-A (Supp.) (see fn. 2, *supra*) the court instructed in the language of:

CALJIC No. 301 (Supp. modified): "Murder is the unlawful killing of a human being with malice aforethought.

"The word 'aforethought' means only that the intent must precede the act as distinguished from afterthought. 'Aforethought' does not (necessarily) imply deliberation or the lapse of considerable time.

"As used in connection with murder, 'malice' may be either express or implied.

"Malice is express when there is an intention unlawfully to kill a human being.

"Malice is implied (1) when the killing results from an act involving a high degree of probability that it will result in death, which act is intentionally done for a base, antisocial motive and with wanton disregard for human life; or (2) when the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life.

"The term 'malice' does not necessarily imply a preexisting hatred or enmity toward the person killed."

CALJIC No. 305 (Supp. modified): "Murder of the second degree is also the unlawful killing of a human being with malice aforethought when there is manifested an intention unlawfully to kill a human being but the evidence is insufficient to establish deliberation and premeditation."

CALJIC No. 305.01 (ltr. supp.): "Murder of the second degree is also the unlawful killing of a human being as the direct causal result of an act involving a high degree of probability that it will result in death, which act is done for a base, antisocial purpose and with wanton disregard for human life.

"When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being."

and on voluntary manslaughter in a context of diminished capacity.[4] No instructions were requested and none was given on voluntary manslaughter as an intentional killing committed "upon a sudden quarrel or heat of passion,"[5] on involuntary manslaughter, on unconsciousness, or on self-defense, or the effect of an unreasonable belief that deadly force was necessary in defense of self.

The duty of the court to instruct, *sua sponte,* on each of these theories of defense will be separately examined in light of the principles set forth below.

■ "It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390].) That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offense were present (see, e.g., *People* v. *Hood* (1969) 1 Cal.3d 444 [82 Cal.Rptr. 618, 462 P.2d 370]), but not when there is no evidence that the offense was less than that charged. (*People* v. *Noah* (1971) 5 Cal.3d 469, 479 [96 Cal.Rptr.

---

[4]The court did not define voluntary manslaughter in statutory terms, but explained to the jury the effect that a finding of diminished mental capacity to entertain the specific mental states that are elements of murder should have on the verdict.

The court modified CALJIC No. 305.1 (Supp.) to instruct: "If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, intoxication or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder. Thus, if you find that the defendant's mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, premeditate, deliberate, or form an intent to kill, you cannot convict him of a wilful, deliberate and premeditated murder of the first degree. Also, if you find that his mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, harbor malice aforethought, as it has been defined for you, you cannot find him guilty of murder of either the first or second degree. In that case you cannot find the defendant guilty of any offense included within Count I of the Information higher than voluntary manslaughter.

"Voluntary manslaughter is the intentional and unlawful killing of a human being with deliberation and premeditation where the evidence shows that due to diminished capacity caused by mental illness or mental defect, the defendant did not have the capacity to attain the mental state constituting malice."

[5]Penal Code, section 192: "Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds: [¶] 1. Voluntary—upon a sudden quarrel or heat of passion. . . ."

441, 487 P.2d 1009]; *People* v. *Osuna* (1969) 70 Cal.2d 759, 767 [76 Cal.Rptr. 462, 452 P.2d 678].) The obligation to instruct on lesser included offenses exists even when as a matter of trial tactics a defendant not only fails to request the instruction but expressly objects to its being given.[6] (*People* v. *Mosher* (1969) 1 Cal.3d 379, 393 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Graham* (1969) 71 Cal.2d 303, 319 [78 Cal.Rptr. 217, 455 P.2d 153].) Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense. (*People* v. *St. Martin, supra,* 1 Cal.3d 524, 533.)

■ The duty to instruct, *sua sponte,* on general principles closely and openly connected with the facts before the court also encompasses an obligation to instruct on defenses, including self-defense and unconsciousness, and on the relationship of these defenses to the elements of the charged offense. Thus, we have held that where evidence of diminished capacity has been presented the court must instruct the jury on the possible relevance of that evidence to finding the existence of the mental elements that are part of the offense of murder (*People* v. *Henderson* (1963) 60 Cal.2d 482, 491 [35 Cal.Rptr. 77, 386 P.2d 677]), and must also instruct the jury on voluntary manslaughter in the diminished capacity context. (*People* v. *Mosher, supra,* 1 Cal.3d 379, 390-391; *People* v. *Castillo* (1969) 70 Cal. 2d 264, 268-269 [74 Cal.Rptr. 385, 449 P.2d 449].)

■ Unlike the rule obliging the court to instruct on lesser included offenses and to give requested instructions whenever there is "any evidence deserving of any consideration whatsoever" (*People* v. *Carmen* (1951) 36 Cal.2d 768, 773 [228 P.2d 281]), the duty to give instructions, *sua sponte,* on particular defenses and their relevance to the charged offense arises only if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case. Indeed, this limitation on the duty of the trial court is necessary not only because it would be unduly burdensome to require more of trial judges, but also because of the potential prejudice to defendants if instructions were given on defenses inconsistent with the theory relied upon. ■ ■ ■ "Appellate insistence upon *sua sponte* instructions which are inconsistent with defense trial theory or not clearly demanded by the evidence would hamper defense attorneys and put trial judges under pressure to glean legal theories

---

[6]Failure to give such an instruction over objection does not require reversal, however, since the error is invited. (*People* v. *Phillips* (1966) 64 Cal.2d 574, 581 [51 Cal.Rptr. 225, 414 P.2d 353].)

and winnow the evidence for remotely tenable and sophistical instructions." (*People* v. *Crawford* (1968) 259 Cal.App.2d 874, 878 [66 Cal.Rptr. 527].)[7]

We turn now to the application of these principles to instructions on the defense of unconsciousness and self-defense which defendant contends should have been given, *sua sponte,* by the trial court.

It appears not only that there was no substantial evidence to warrant giving instructions on either defense, and that there was no basis upon which to conclude that defendant was relying on either of those theories, but that these defenses were inconsistent with the accidental death defense asserted by defendant. ■ Unconsciousness, when not voluntarily induced (*People* v. *Conley* (1966) 64 Cal.2d 310, 323-324 [49 Cal.Rptr. 815, 411 P.2d 911]) is a complete defense to a criminal charge. (Pen. Code, § 26, subd. Five.) ■ An unconscious act within the contemplation of the Penal Code is one committed by a person who because of somnambulism, a blow on the head, or similar cause is not conscious of acting and whose act therefore cannot be deemed volitional. (*People* v. *Hardy* (1948) 33 Cal.2d 52, 66 [198 P.2d 865].) ■ Defendant apparently relies on the evidence that he had been struck on the head and staggered as the basis for an inference that his subsequent acts were not volitional in that he had been unconscious when he shot Officer Klass. Had he expressly relied on this defense and requested an instruction thereon, we would be forced to conclude that the evidence was sufficient to entitle him to the instruction. (*People* v. *Carmen, supra,* 36 Cal.2d 768, 773.)

In the absence of such a request and in the face of defendant's own testimony that he recalled at least 95 percent of the events surrounding the shooting, only the most tenuous of reasoning might lead the trial court to

---

[7]We deem it appropriate to emphasize that the duty of counsel to a criminal defendant includes careful preparation of and request for all instructions which in his judgment are necessary to explain all of the legal theories upon which his defense rests. If it appears to the court, however, that there is substantial evidence that would support a defense inconsistent with that advanced by a defendant, the court should ascertain from the defendant whether he wishes instructions on the alternative theory. Such inquiry will afford assurance that the theory has not been inadvertently overlooked by counsel. (Cf. *People* v. *Hood, supra,* 1 Cal.3d 444, 449; *People* v. *Wade* (1959) 53 Cal.2d 322, 334 [1 Cal.Rptr. 683, 348 P.2d 116].)

When the charged offense is one that is divided into degrees or encompasses lesser offenses, and there is evidence from which the jury could conclude that the lesser offense had been committed, the court must instruct on the alternate theory even if it is inconsistent with the defense elected by the defendant under the rule obliging the court to instruct on lesser included offenses discussed *supra.*

suspect that defendant might have been unconscious or that he was relying on unconsciousness as a defense. It is possible that one might conclude that defendant's testimony that he did not shoot Officer Klass, offered in the face of overwhelming evidence to the contrary, warranted an inference that he did not remember the shooting because he was unconscious due to the blow on the head. Such an inference would be reasonable only if defendant's additional testimony describing the manner in which Officer Van Pelt allegedly caused the gun to fire were disregarded. We do not require such Olympian feats of mental gymnastics of our trial judges. Defendant elected a defense that presupposed that he was conscious at the time of the killing. The court was not required to draw a contrary inference or to instruct, *sua sponte,* on unconsciousness.

By a parity of reasoning there was no error in failing to instruct, *sua sponte,* on self-defense. A homicide is justifiable when committed in defense of self "when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished." (Pen. Code, § 197, subd. 3.) Here defendant presented evidence that he had been kicked and choked immediately before he seized the weapon in a "reflex action." There was no evidence, however, that defendant believed his life was endangered and he expressly denied any resistance to the assault and any intent to shoot Officer Klass. He testified that the assault had ended at the time of the shooting, that he shot into the air in order to startle the officers, and he twice specifically disclaimed firing the gun as a means of self-defense.

It is not error to refuse a request for instructions on self-defense when there is no evidence from which it can be inferred that the defendant feared great bodily harm or death at the hands of the victim, or when the defendant has denied acting in self-defense and claimed the death was accidental. (*People* v. *Manning* (1905) 146 Cal. 100 [79 P. 856].) A fortiori, a *sua sponte* instruction is not required. Since there was no evidence that defendant believed he was acting in self-defense, there was likewise no basis for an instruction on the effect of an unreasonable belief that deadly force was necessary in defense of self.

Defendant also contends that the court should have instructed the jury on voluntary manslaughter committed in the heat of passion (Pen. Code, § 192, subd. 1) and involuntary manslaughter as a nonmalicious homicide committed by a person lacking the mental capacity to form either the intent to kill or to harbor malice. (*People* v. *Conley, supra,* 64 Cal.2d 310, 324-326, fn. 4.)

 Voluntary manslaughter committed on sudden quarrel or heat of passion is a lesser offense included within the crime of murder. (*People v. Dewberry* (1959) 51 Cal.2d 548, 555-557 [334 P.2d 852].) Unlike most necessarily included offenses, however, where instructions must be given *sua sponte* if there is any possibility that the jury might have a reasonable doubt whether all of the elements of the greater offense have been proven, voluntary manslaughter in the heat of passion is unique in that the statutory definition of the offense specifies the circumstances in which the law will presume the absence of malice, the element which distinguishes murder from manslaughter. If a killing, even though intentional, is shown to have been committed in a heat of passion upon sufficient provocation the absence of malice is presumed. (*People v. Brubaker* (1959) 53 Cal.2d 37, 44 [346 P.2d 8].)

 However, unless it appears from the prosecution's case that the killing was committed in the heat of passion and upon sufficient provocation the burden is on the defendant to raise a reasonable doubt in the minds of the jurors that malice was present. (*Jackson v. Superior Court* (1965) 62 Cal.2d 521, 526 [42 Cal.Rptr. 838, 399 P.2d 374].) Because the existence of malice is presumed when the circumstances of a killing suggest an intent to kill or that " 'the killing proximately resulted from an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' " (*People v. Phillips, supra,* 64 Cal.2d 574, 587), provocation *and* heat of passion must be affirmatively demonstrated. (*People v. Williams* (1969) 71 Cal.2d 614, 623 [79 Cal.Rptr. 65, 456 P.2d 633]; *People v. Morse* (1969) 70 Cal.2d 711, 734-735 [76 Cal.Rptr. 391, 452 P.2d 607].) It is not enough that provocation alone be demonstrated. There must also be evidence from which it can be inferred that the defendant's reason was in fact obscured by passion at the time of the act. (*People v. Morse, supra,* 70 Cal.2d 711, 734; *People v. Logan* (1917) 175 Cal. 45, 49 [164 P. 1121].) Before a court must instruct *sua sponte* on voluntary manslaughter in the heat of passion as a lesser offense included within murder there must be either some evidence that heat of passion was present at the time of the killing or some reason for the court to know that the defendant is relying on that theory of manslaughter as a defense.

Here defendant testified that the arresting officers kicked and choked him although he was not resisting. That evidence might form the basis for a finding of adequate provocation. But no evidence was offered that suggested that defendant was acting in a resultant heat of passion when he shot Officer Klass. He not only denied intending to shoot Officer

Klass when he took the gun, a fact that would not preclude giving a requested instruction on voluntary manslaughter (*People* v. *Dewberry, supra,* 51 Cal.2d 548, 557), but twice expressly denied fighting back when he was being beaten. Additionally, he testified that he realized as soon as he took the gun that it was wrong to have done so and therefore fired into the air. Had defendant elected to invite the jury to speculate as to whether he had shot the officer in a heat of passion resulting from the assault upon him by the officer, notwithstanding his testimony to the contrary, he might have requested and received instructions on voluntary manslaughter in that context since inconsistent defenses may be offered. He may not, however, expect the trial judge to give a *sua sponte* instruction on that theory of manslaughter when his own testimony is to the effect that he was not acting in a heat of passion and there is neither direct evidence of heat of passion nor reason for the court to know that he is relying on that defense.

It was error, however, for the court to fail to give a *sua sponte* instruction on involuntary manslaughter. (Pen. Code, § 192, subd. 2.) Petitioner correctly contends that the evidence of diminished capacity was sufficient to warrant a *sua sponte* instruction because the jury might have believed that although he was conscious at the time of the shooting he lacked both the intent to kill and malice. (*People* v. *Mosher, supra,* 1 Cal. 3d 379, 391.) The People suggest that the error was not prejudicial in the circumstances of this case since the jury, under the instructions given on first degree murder, necessarily found both that the killing was intentional and that it was committed with malice.

A similar contention was made in *People* v. *Modesto* (1963) 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33]. There a majority of this court held that a defendant has a constitutional right to have the jury determine every material issue presented by the evidence; that an erroneous failure to instruct on a lesser included offense constitutes a denial of that right; and that such error cannot be cured by weighing the evidence and finding it not reasonably probable that a correctly instructed jury would have convicted the defendant of the lesser included offense. (*Id.* at p. 730.) We adhere to that portion of the decision. The *Modesto* majority, however, also held that the error cannot be cured in appropriate circumstances by examining the verdict in the light of the instructions given and finding that the jury necessarily resolved, although in a different setting, the same factual question that would have been presented by the missing instruction. (*Id.* at p. 731.)

The latter *Modesto* rule was vigorously criticized in the dissenting opinion of Justice Schauer (*id.* at pp. 744-757), and experience during the

decade since *Modesto* has demonstrated that adherence to that rule is neither necessary to assure defendants their right to jury consideration of all material issues presented by the evidence nor required to avoid prejudice. Thus, in some circumstances it is possible to determine that although an instruction on a lesser included offense was erroneously omitted, the factual question posed by the omitted instruction was necessarily resolved adversely to the defendant under other, properly given instructions. In such cases the issue should not be deemed to have been removed from the jury's consideration since it has been resolved in another context, and there can be no prejudice to the defendant since the evidence that would support a finding that only the lesser offense was committed has been rejected by the jury. Therefore, to the extent that *Modesto* and cases following it hold that the erroneous failure to give an instruction on a lesser included offense is necessarily prejudicial, even though it reasonably appears from the verdict and the instructions given that the jury rejected the evidence tending to prove the lesser offense, they are overruled.

 In the instant case, the jury necessarily rejected defendant's evidence that his diminished capacity negated intent to kill when it found the shooting to be first degree rather than second degree murder. Thus, the failure to give an instruction on involuntary manslaughter could not have been prejudicial to defendant since the offense could have been no less than voluntary manslaughter. Had there been no further error we could affirm the judgment since failure to give that instruction did not remove a material issue from the consideration of the jury.

However, jury consideration of the application of defendant's diminished capacity defense to the existence of malice, the element which distinguishes murder from either voluntary or involuntary manslaughter, was precluded by the court when it gave a second degree felony-murder instruction based on the escape[8] and a further instruction that if the killing occurred during an escape the offense could be no less than second degree murder.

Defendant's trial took place prior to our decision in *People* v. *Lopez* (1971) 6 Cal.3d 45, 51-52 [98 Cal.Rptr. 44, 489 P.2d 1372], in which we held that, viewed in the abstract, escape is not an inherently dangerous felony from the commission of which malice may be implied. It is,

---

[8]The jury was instructed in the language of CALJIC No. 305.02 (ltr. supp.): "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a direct causal result of the commission of or attempt to commit a felony inherently dangerous to human life, namely, the crime of escape (with force and violence) and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the second degree. . . ."

therefore, error to give an instruction on second degree murder predicated upon escape as the underlying felony. ■ The rule announced in *Lopez* is applicable to cases pending on direct appeal at the time of that decision. (Cf. *People* v. *Sears* (1970) 2 Cal.3d 180, 188 [84 Cal.Rptr. 711, 465 P.2d 847], applying the rule of *People* v. *Ireland* (1969) 70 Cal.2d 522 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323] to a pre-*Ireland* trial.) ■ This error might not have been prejudicial, since the first degree murder verdict suggests that the jury did not base its decision on the second degree felony-murder instruction, had the court not implemented it by also instructing that: "If you find beyond a reasonable doubt, that Officer Klass' death was proximately caused by the defendant and, further, that the death occurred during the commission of an escape with force or violence, then the killing, regardless of diminished capacity if such existed, must be *at least* second degree murder." (Italics added.) The clear implication of this instruction was that an initial determination that the killing occurred during an escape made it necessary to find malice and that if it was also determined that the killing was wilful, premeditated, and deliberate, the offense was first degree murder. Since no instructions were given on when the escape might have terminated and we perceive no basis upon which the jury might have avoided the conclusion that the killing took place during an escape, the threshold for the jury's deliberations may well have been that the killing could be no less than second degree murder. If so, the material issue of the existence *vel non* of malice was removed from its consideration.

The People concede the effect of the second degree felony-murder instructions, but argue that the concept of malice is encompassed within a finding that the killing was wilful, premeditated, and deliberate. They therefore urge that notwithstanding the error the jury necessarily found all of the elements of first degree murder.

■ The mental state comprising malice is independent of that encompassed within the "wilful, deliberate, and premeditated" concepts that are elements of first degree murder. (*People* v. *Holt* (1944) 25 Cal.2d 59, 70 [153 P.2d 21].) Ill will toward or hatred of the victim are not requisites of malice as that term is used in defining murder. (*People* v. *Bender* (1945) 27 Cal.2d 164, 180 [163 P.2d 8].) Early instructions explained that if the killing was done in circumstances that evidence "an abandoned and malignant heart" malice could be found. (*People* v. *Thomas* (1953) 41 Cal.2d 470, 480 [261 P.2d 1].) Considered too cryptic, that instruction was superseded by one explaining that malice was evidenced by circumstances indicating that the killing was proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was delib-

erately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People* v. *Phillips, supra,* 64 Cal.2d 574, 587; *People* v. *Washington* (1965) 62 Cal.2d 777, 780 [44 Cal.Rptr. 442, 402 P.2d 130].) And, in *People* v. *Conley, supra,* 64 Cal.2d 310, 322, we noted that a person who was capable of deliberation, i.e., who carefully weighed the course of action he was about to take and chose to kill his victim after considering the reasons for and against it, would normally be capable of comprehending his duty to act within the law, but we also noted that if he were not capable of such comprehension his act was not malicious. We explained that this particular type of awareness, "awareness of the obligation to act within the general body of laws as regulating society" is required by the statutory language describing implied malice in terms of "abandoned and malignant heart"[9] since those words imply an anti-social motivation.

The People argue, however, that a defendant who has deliberated, who has carefully weighed his course of action and has considered the reasons for and against it, must have considered among those reasons the fact that it is unlawful and that he is obliged to act within the law. A similar argument was made by the People in *People* v. *Conley, supra,* 64 Cal.2d 310, 322-323. In rejecting it we noted that at least since the decision in *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492] it has been settled that a defendant whose mental capacity was diminished by mental illness, disease or defect short of insanity, or by intoxication, might have premeditated and deliberated his act before killing and yet have been incapable of harboring malice.

Here there was expert testimony that defendant was schizophrenic, paranoid, delusional, and overly suspicious, that he felt threatened, lacked judgment, and did not have the ability to act with malice aforethought. The jury was instructed that "Malice is express when there is an intention unlawfully to kill a human being. [¶] Malice is implied (1) when the killing results from an act involving a high degree of probability that it will result in death, which act is intentionally done for a base, anti-social motive and with wanton disregard for human life; or (2) when the killing is a direct causal result of the perpetration or the attempt to perpetrate a felony inherently dangerous to human life." The jury was not instructed in the language suggested by this court in *People* v. *Conley, supra,* 64 Cal.2d 310, 324, footnote 4, that evidence of diminished capacity could rebut the pre-

---

[9]Penal Code section 188: "Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."

sumption that a person is able to comprehend the prohibition of acts dangerous to human life and the obligation to conform his conduct to the law. We cannot assume, therefore, that in finding that the defendant deliberated his conduct, the jury necessarily found that he was capable of comprehending his duty to conform his conduct to the law and after weighing that obligation made a reasoned decision to kill.

The existence of malice was a material issue raised by the evidence. We cannot determine that under the instructions given to it the jury necessarily considered this issue.

The judgment is reversed.

Tobriner, J., Mosk, J., and Sullivan, J., concurred.

**DRAPER, J.**\*—I dissent.

I heartily concur in the overruling of the decision (*People* v. *Modesto,* 59 Cal.2d 722 [31 Cal.Rptr. 225, 382 P.2d 33]) which holds that failure to instruct upon a lesser included·offense is necessarily reversible error, even though absence of prejudice is clear from the jury's obvious rejection of evidence which tended to prove the lesser offense.

I cannot, however, concur in the majority's blunting of this salutary change when it finds error in an instruction which seems to me entirely proper and which, even if erroneous, could not conceivably have affected the verdict.

The majority holds that it was error to instruct that "escape with force or violence" invokes the second degree felony-murder rule. I cannot agree. Under the facts of this case, and the language of the instruction here given, the decision relied upon by the majority (*People* v. *Lopez,* 6 Cal.3d 45 [98 Cal.Rptr. 44, 489 P.2d 1372]) is readily distinguishable and cannot apply. In *Lopez,* the defendant and others had escaped from a county jail without detection, and obviously without violence. Two days later, a codefendant broke into a home to obtain food, and violently assaulted the couple who lived there, killing one of them. The jury was instructed that "The unlawful killing of a human being . . . which occurs as the direct causal result of the commission of or attempt to commit a felony inherently dangerous to human life, namely, the crime of escape, . . . is murder of the second degree." As the court pointed out, the statutory proscription of escape from a jail (Pen. Code, § 4532) is extremely broad. The court emphasized that the range of "escape," as defined in the code section as

*Assigned by the Chairman of the Judicial Council.

a whole, is overly comprehensive. "The included modes of escape range from those involving force or violence to tardiness on the part of one engaged in a work furlough program." (6 Cal.3d at p. 51.) "It applies to the man who is tardy in returning from a work furlough as well as to the man who obtains a contraband weapon and decides to shoot his way out of jail." (*Id.*) "It applies to those who, like this defendant, fashion a rope from blankets, climb down it, and steal into the woods as well as to those who strangle a guard to obtain his key. We cannot conclude that those who commit nonviolent escapes such as those here suggested thereby perpetrate an offense which should logically serve as the basis for the imputation of malice aforethought in a murder prosecution." (*Id.*)

Here, however, the evidence is clear that the escape was by force and violence in its inception within the jail. The escape continued uninterruptedly, and the degree and severity of the force and violence increased, throughout the officers' immediate and brief pursuit from the jail down a city street to the point at which defendant fatally shot one officer and shot at another. The instruction on the second degree murder rule, given in the case at bench and quoted by the majority, did not in any way purport to imply malice from all escapes within the broad range of section 4532. Rather, the imputation was expressly limited to death proximately caused by defendant during his commission of "an escape with force or violence." Thus "tardiness on the part of one engaged in a work furlough program" and a quietly successful stealing away from jail are excluded. Only escape by force or violence was permitted to be considered by the jury as implying malice. It seems indisputable that an escape by force and violence is an anti-social act and that it inherently and in the abstract is dangerous to life.

I am aware that, by footnote, *Lopez* declares that section 4532 "does not . . . create two separate offenses—i.e., nonviolent escape and violent escape." (6 Cal.3d at p. 52, fn. 9.) The comment is, of course, unnecessary to the decision, which dealt only with an escape effected without force or violence. But section 4532 does clearly distinguish between those escapes effected by force or violence and those which are not. The state prison term for escape without force or violence is one year and one day, while that for escape by force or violence is "not exceeding 10 years." Moreover, a violation of section 4532 "not by force or violence shall not be charged as a prior felony conviction in any subsequent prosecution for a public offense." Thus, the code section itself distinguishes between the minor and the major offenses covered by its broad scope.

Here, the trial court limited application of the second degree murder-felony rule to the "commission of an escape with force or violence." Thus

the basic tenet of *Lopez* is absent here. The nonviolent escape, although made an offense within the broad scope of the section as a whole, is eliminated. Only the violent escape, recognized by section 4532 as the more serious and more severely punishable crime, is postulated as the basis for the finding of second degree murder. However abstractly the issue is considered, I find no error in instructing that an unlawful killing which occurs as a direct causal result of an escape by force and violence is second degree murder.

Even if *Lopez* were applicable, however, it only establishes that the second degree murder-felony instruction was erroneous. It does not, under the particular facts of this case, determine the question of prejudice. The majority holds that the instruction was prejudicial because under it "jury consideration of the application of defendant's diminished capacity defense to the existence of malice, the element which distinguishes murder and either voluntary or involuntary manslaughter, was precluded." I cannot agree. It is quite true that implied malice cannot be found if the defendant's capacity were so diminished as to preclude "awareness of the obligation to act within the general body of laws regulating society." (*People* v. *Conley,* 64 Cal.2d 310, 322 [49 Cal.Rptr. 815, 411 P.2d 911].) Here, however, defendant's own testimony negates an absence of such awareness. As the majority notes, defendant testified that he took the gun in a "reflex action," "realized as soon as he took the gun that it was wrong to have done so and therefore fired into the air." He testified that the second officer grabbed defendant's gun hand, forcing the gun to discharge a second time, and that this second bullet struck Officer Klass. This testimony evinces a clear and present awareness of his obligation to act within the general body of the law regulating society. His testimony that he therefore fired the first shot into the air establishes his recognition that firing at Officer Klass would endanger human life. The only fact issue remaining was whether he had voluntarily pulled the trigger for the shot that killed Officer Klass, or whether Officer Van Pelt's grasping of his hand caused the gun to discharge the fatal bullet. The jury obviously resolved that issue against him. Thus his own testimony contradicted the present claim of diminished capacity as negating implied malice. It follows, as the majority holds as to the claimed defenses of unconsciousness, heat of passion, and self-defense, that defendant's own testimony left no factual basis for a *Conley* instruction and precluded reliance on the theory that he was unable to comprehend either the "prohibition of acts dangerous to human life," or "the obligation to conform to the law." The conclusion of the defense psychiatrist as to defendant's mental capacity at the moment of the shooting obviously was based upon his out-of-court interview with defendant, and

the latter's statements to him at that interview. But defendant's own testimony before the jury completely removed the basis for the expert's conclusion.

The majority adheres to that portion of the *Modesto* rule that "defendant's right to a manslaughter instruction when there is evidence thereof precludes not only our weighing that evidence to determine the likelihood that a properly instructed jury would have found manslaughter, but also our attempting to determine how the failure to present the issue of manslaughter to the jury may or may not have influenced its choice between first and second degree murder." (59 Cal.2d at p. 731). It is apparently upon a somewhat extended application of that rule that the majority finds prejudice in the claimed removal from jury consideration of the issue of malice. Since defendant's own testimony left no factual basis for the finding which would warrant a manslaughter verdict, no issue of importance to defendant was removed from the jury by the instruction upon escape with force or violence as invoking the second degree murder-felony rule.

The majority now overrules *Modesto* insofar as it holds that failure to instruct upon a lesser included offense is prejudicial per se. The majority opinion makes clear that it does look to the evidence, which it summarized at some length, to conclude that there was no prejudice in the court's failure to instruct upon unconsciousness, heat of passion, and self-defense. I am entirely unable to distinguish in this respect between looking to the evidence to find whether omission of an instruction (which necessarily "precludes" jury consideration) was prejudicial, and looking to it to find whether prejudice inhered in an affirmative instruction which "precludes" jury consideration. The effect, in either case, is the same, and if the evidence is to be looked to in the one case, it is equally logical to do so in the other.

The constitutional provision (Cal. Const., art. VI, § 13, formerly § 4½), proscribes the reversal of a judgment "in any cause, on the ground of misdirection of the jury . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." It is arguable that this language does not authorize a reweighing by the court of many types of conflicting evidence. Here, however, the defendant (unlike the *Modesto* defendant) did testify. His testimony completely eliminated all factual support for the conclusion of the psychiatrist. In this unusual situation, conflict, if any, is so minimal and the determination of the jury so apparent from review of the evidence and from its unanimous verdict, that it seems to me a clear flouting of section 13 to refuse to look to the

evidence given by defendant in deciding whether he was prejudiced by the instruction.

I would affirm the judgment.

McComb, J., and Burke, J., concurred.