Filed 9/15/20  P. v. Williams CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>GLEN WILLIAMS,<br><br>Defendant and Appellant. | F077722<br><br>(Super. Ct. No. MF012770A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  David Wolf, Judge.

Gabriel Bassan, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Carlos A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted defendant Glen Williams of one count of battery by a prisoner on a nonconfined person in violation of Penal Code section 4501.5 after he engaged in a scuffle with correctional officers while in prison. The jury acquitted defendant of a second count of battery as it related to another officer. Defendant challenges his conviction, arguing the trial court reversibly erred in denying his request to instruct the jury on self-defense because he contends there was evidence the officers used excessive force against him.

We affirm the judgment.

## FACTUAL BACKGROUND

On June 2, 2017, three officers began to escort defendant, an inmate, to his assigned cell from a holding cell. Defendant physically resisted because he did not want to return to his assigned cell. A scuffle ensued and defendant was subsequently charged with kicking two of the escorting officers during the incident.

### *Prosecution*

The three escorting officers involved in the June 2, 2017, incident and an observing officer testified at trial.

### **Sergeant Toscano**

Sergeant Michael Toscano worked as a correctional officer in the California Correctional Institution, Tehachapi. He testified that on June 2, 2017, defendant asked to speak to a sergeant; accordingly, Sergeant Toscano spoke with defendant at the holding cell where defendant was being held. During their conversation, defendant told Sergeant Toscano he did not want to return to his assigned cell. Instead, he wanted to be housed in administrative segregation because he did not want to be with other inmates. Sergeant Toscano explained "administrative segregation" is a prison unit where inmates are sent when they commit a rule violation within the institution that warrants separation from the general population. When in administrative segregation, an inmate is kept in restraints

2.

any time he leaves his cell. Sergeant Toscano could not put defendant in administrative segregation without a reason. So, he informed defendant the officers were going to transport him back to his assigned cell. Sergeant Toscano then asked Officer James Robinson and Sergeant Brandon Gentry to assist him in escorting defendant back to his assigned cell.

Defendant complied with Sergeant Toscano's orders to submit to restraints; he stood up, turned around to face the back of the holding cell, and placed his hands behind his back and into the unlocked food port to permit the officers to handcuff him. Sergeant Toscano handcuffed defendant and ordered him to step towards the back of the holding cell; again, defendant complied. Sergeant Gentry then unlocked the holding cell door and opened it. At the time, defendant's legs were unrestrained. Officer Robinson approached defendant, grabbed his left arm to secure him, and told him to step backwards out of the holding cell; defendant again complied. At that point, no force had been used against defendant.

Sergeant Toscano then heard a commotion and saw defendant "kick[ing] out his legs" and trying to "pull away" from Officer Robinson. He saw defendant kick Sergeant Gentry. Sergeant Toscano testified he "clearly remember[ed] seeing the defendant's leg make contact with … Sergeant Gentry['s]" lower leg. Sergeant Toscano then saw the officers take defendant to the ground almost simultaneously and defendant "was still struggling … [and] kicking out his legs." Sergeant Toscano ran to defendant and tried to secure him from hitting or kicking anyone else by grabbing his ankles; defendant continued to kick and twist from side to side.

Sergeant Toscano grabbed defendant's pant legs and defendant continued to kick; Sergeant Toscano lost control of one of defendant's legs, and defendant kicked him in the stomach. Sergeant Toscano backed away and struck defendant one time on his right thigh with a baton to subdue him. Defendant stopped resisting, and Officer Robinson secured his legs while Sergeant Toscano retrieved leg restraints. Sergeant Toscano put

3.

leg restraints on defendant, and defendant was returned to the holding cell. Sergeant Toscano denied using any force against defendant during the incident besides striking him once with the baton. He also denied sustaining any lasting injuries as a result of defendant kicking him.

**Officer Robinson**

Officer Robinson also testified at trial to a series of events consistent with Sergeant Toscano's testimony. He recalled that on June 2, 2017, Sergeant Toscano asked him and Sergeant Gentry to assist with escorting defendant from a holding cell to defendant's assigned cell and that defendant complied with Sergeant Toscano's orders to turn around, submit to handcuffs, and exit the holding cell backwards. Once defendant stepped out of the cell, Officer Robinson placed his hand on defendant's left biceps to guide him towards his assigned cell; he denied squeezing defendant's arm in a hard manner. Defendant "became resistive and started tugging away"; he stated he was not going back to his assigned cell. Defendant "stopped" his forward movement, "started twisting his body," and tried to break out of Officer Robinson's grasp. While standing, defendant began to kick backwards in Sergeant Gentry's direction, though Officer Robinson did not witness defendant's foot strike Sergeant Gentry. After he saw defendant kick towards Sergeant Gentry, Officer Robinson "responded and used [his] physical strength and body weight and pulled [defendant] to the ground to prevent him from further attacking or kicking anybody"; it happened "almost simultaneously." Before that point, Officer Robinson denied exerting any physical force on defendant. Officer Robinson hooked his arm through defendant's and pulled him down while ordering defendant to "get down." Officer Robinson, who weighed approximately 310 pounds, landed on top of defendant. Officer Robinson applied what he believed to be necessary force with his hands and body weight on defendant's upper left shoulder and lower back, and he used his right knee on defendant's lower back to "keep him from

4.

squirming"; defendant continued to kick. Officer Robinson then saw Sergeant Toscano try to grab defendant's feet to control them, but defendant kicked out of Sergeant Toscano's grasp and kicked him in the stomach. Officer Robinson saw defendant's legs strike Sergeant Toscano in the stomach. Sergeant Toscano let go of defendant's feet and struck him once with his baton. Defendant stopped resisting and became compliant.

**Sergeant Gentry**

Sergeant Gentry also testified to a version of events consistent with Officer Robinson's and Sergeant Toscano's. He testified he was with Officer Robinson when Sergeant Toscano radioed Officer Robinson to assist him with an escort; they both responded to defendant's holding cell. Defendant complied with orders as he was handcuffed and exited the cell. Sergeant Gentry placed his left hand on the inside of defendant's right arm to escort him. No officer had used force against defendant at that time. They took a step or two and then, while standing, defendant began to kick and twist, kicking towards Sergeant Gentry multiple times. Defendant struck Sergeant Gentry's left shin and Sergeant Gentry felt sharp pain. Sergeant Gentry told defendant to stop kicking him and to get on the ground. Defendant continued kicking and struck Sergeant Gentry again on his right knee; again, Sergeant Gentry felt sharp pain. Sergeant Gentry used his physical strength and his grasp of defendant's right arm to pull defendant to the ground. Defendant landed on his stomach. Sergeant Gentry denied kicking, striking, hitting, or elbowing defendant. Sergeant Toscano then tried to grab defendant's legs but defendant continued to kick; he kicked Sergeant Toscano in the stomach with his feet. Sergeant Toscano unholstered his baton and struck defendant one time in the right thigh. Defendant became compliant and stopped resisting. The People introduced photographs of Sergeant Gentry's legs after the incident at trial; his left shin and his right knee were red and both had abrasions on them which, he testified, resulted from defendant's kicks.

**Officer Pitt**

Officer Seth Pitt witnessed the June 2, 2017, incident from the control booth. He saw the officers escort defendant out of the holding cell, and then defendant started twisting and kicking. He saw defendant kick Sergeant Gentry before defendant was taken to the ground. Defendant continued to kick while he was on the ground, but Officer Pitt did not see him strike anyone. He saw Sergeant Toscano take out his baton and strike defendant and defendant then began complying.

**Officer Blackburn**

After the defense rested, the prosecutor called Lieutenant Scott Blackburn, who testified he conducted a videotaped interview with defendant on June 2, 2017, because defendant claimed he was the subject of unnecessary force. The videotaped interview was played for the jury. In it, defendant explained to Lieutenant Blackburn that the officers were trying to force him back to his cell while he refused; then, they slammed him to the ground and started hitting him and accusing him of battery. Defendant stated they "used illegal excessive force" by trying to force him back to program housing. Defendant explained his resulting injuries and Lieutenant Blackburn videotaped them.

*Defense*

Defendant testified on his own behalf and denied hitting or striking any of the officers that day. According to defendant, on the day of the incident, someone had opened his cell door to permit him to slide out his breakfast tray. Defendant walked out of the cell. An officer repeatedly ordered defendant to return to his cell. Defendant refused and stated he wanted to go to restricted housing, also known as administrative segregation. At trial, he explained prisoners were less restrained in "program housing," and he preferred restricted housing because he would not have to worry about conflicts.

Staff members responded to defendant, handcuffed him, and transferred him to a holding cell where he waited. A few minutes later, Officer Robinson arrived and asked defendant what was going on; defendant said he was refusing to return to program

6.

housing.  Officer Robinson explained to defendant he could not refuse program housing and then he left.  Sergeant Toscano came to the holding cell.  Defendant again said he was refusing program housing.  Sergeant Toscano also explained to defendant that he could not refuse program housing before he walked away.

Sergeant Toscano returned a few minutes later with Officer Robinson and Sergeant Gentry.  Sergeant Toscano ordered defendant to turn around and submit to handcuffs.  Defendant continued to say he was refusing program housing, but he complied with the directives because he believed the officers were taking him to restricted housing.  Defendant complied with orders to walk to the back of the holding cell and then to back out of the cell.  He confirmed no officer had touched him at that point.  Officer Robinson grabbed defendant's arm when he exited the cell, and the officers tried to pull him towards program housing.

Defendant realized the officers were trying to take him to program housing, so he tried to bend towards the ground to resist without attacking the officers.  The officers pulled and dragged defendant as he tried to pull them to the ground, and "then they pushed [defendant] on the ground."  Defendant struggled with the officers; after the officers pushed him to the ground, "they kept pulling and dragging [defendant] and trying to force [him] up."  Each time the officers pushed defendant down, they put their weight on him.  He could not move his legs.  The third time the officers forced defendant up, they "slammed [him] back down and kept ordering [him] to stop refusing to go to [program] housing."  According to defendant, Sergeant Toscano punched him hard in his forehead and told defendant that he had kicked the staff.  Officer Robinson and Sergeant Gentry then started hitting and punching defendant's body before placing mechanical restraints on his legs.  After that, defendant stopped resisting.  Defendant denied kicking or intending to assault any of the officers.

After the officers placed defendant in leg restraints, Officer Robinson and another assistant staff member escorted defendant back to his assigned cell.  Later, they took him

to restricted housing. According to defendant, during that escort, Officer Robinson and the staff member pushed defendant to the ground. Sergeant Toscano and Sergeant Gentry were in the room; they ran over and began hitting defendant's face and body while telling him to stop resisting even though he was not resisting. Defendant again denied kicking or assaulting any officer at that time, stating he could not move his body because he was lying on his stomach with the officers on top of him. The officers continued to hit him. Eventually, they took defendant to restricted housing. Defendant recalled speaking with a lieutenant after the incident, and the lieutenant photographed defendant's body. The photographs were admitted at trial; defendant testified the redness in the photographs resulted from the officers hitting him. When shown pictures of Sergeant Gentry's injuries, defendant denied kicking him; however, he testified Sergeant Gentry could have sustained the injuries while attacking defendant.

In closing, defense counsel argued, in part, that defendant did not willfully touch the officers. Instead, he was flailing his legs and writhing his body in resistance; he did not commit a willful battery. Defense counsel directed the jury to CALCRIM No. 3404, noting that if the jury concluded defendant acted accidentally, it was a defense to the charges.

### Verdict

Defendant was charged with two violations of Penal Code section 4501.5, battery on a nonconfined person—count 1 related to Sergeant Gentry and count 2 related to Sergeant Toscano—as a result of the incident. The jury convicted defendant of count 1 (battery of Sergeant Gentry) but acquitted him of count 2 (battery of Officer Toscano). The court sentenced defendant to eight years' imprisonment.

## DISCUSSION

In his sole issue on appeal, defendant contends the court reversibly erred in refusing to instruct the jury on self-defense. Because defendant was acquitted of the charge related to Sergeant Toscano, our review is limited to whether the court

8.

prejudicially erred in failing to give a self-defense instruction as it relates to the charge pertaining to Sergeant Gentry.

**Relevant Factual Background**

After the presentation of evidence, defense counsel argued in support of a self-defense jury instruction. He noted defendant "has denied flatly that he struck an officer," willfully or accidentally, but the officers testified defendant struck them. Accordingly, there was a "dispute in that evidence," and he was not limited to arguing the version of events testified to by defendant. The jury was also not required to pick one version of events or the other but rather could accept or reject parts of each witness's testimony.

Thus, he argued, it was "consistent with the evidence … to … claim … [defendant] did strike an officer, but that the strike of the officer didn't follow the officer's timeline, and that … it was after the excessive use of force against [defendant]." Defense counsel argued the evidence could support such an interpretation even though "no witness ha[d] yet specifically stated as much." He noted, "in order to instruct on self-defense, the evidence only needs to raise a reasonable doubt about that issue," even if self-defense is not "actually asserted" or "actually proven."

The prosecutor responded the evidence did not support a self-defense instruction. He explained the officers testified defendant kicked Officer Gentry before any force was used against defendant. Rather, the first use of force occurred when the officers took defendant to the ground, which occurred after defendant kicked Officer Gentry. Then, while on the ground, defendant kicked Sergeant Toscano while he was trying to restrain defendant's legs; "Sergeant Toscano had not used any force against the defendant at that time."

He further argued the "key here for the lack of self-defense is the defendant's own testimony." Defendant denied kicking or striking the officers entirely. So, "the only way that there could possibly be a self-defense argument is if the jury were to believe a

9.

portion of the officer's testimony, disbelieve the defendant's testimony, and come up with … their own … separate scenario that has not been testified by any witness and is not a logical inference based on the testimony of the officers, which under all of their testimony there would be no self-defense argument in this case. And by the defendant's own testimony, he never used any act of force against him, therefore he didn't act in self-defense."

The court agreed with the prosecution that the evidence did not support a self-defense instruction. It concluded, "[L]ooking at the evidence, I must have some evidence, not just speculation. And if I look at actual evidence that's coming into the trial, I don't see any evidence of self-defense either from prosecution or the defense." Relatedly, the court concluded instructions on an officer's lawful performance of duties and use of force were not relevant.

## I.      Standard of Review

We review de novo a court's decision not to give a particular jury instruction. (See *People v. Simon* (2016) 1 Cal.5th 98, 133; *People v. Manriquez* (2005) 37 Cal.4th 547, 581; *People v. Waidla* (2000) 22 Cal.4th 690, 733.) An instruction requested by a defendant need only be given "if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration." (*People v. Marshall* (1997) 15 Cal.4th 1, 39; accord, *People v. Moon* (2005) 37 Cal.4th 1, 30 ["a trial court may properly refuse an instruction offered by the defendant if it … is not supported by substantial evidence"]; *People v. Curtis* (1994) 30 Cal.App.4th 1337, 1355 ["A trial court has no duty to instruct the jury on a defense—even at the defendant's request—unless the defense is supported by substantial evidence"]; *People v. Elize* (1999) 71 Cal.App.4th 605, 615 ["in the event that there is substantial evidence of a defense inconsistent with the defense advanced by the defendant," the court should give the instruction on the alternate defense "if the defendant simply requests the instruction expressly"].) "The trial court need not give

instructions based solely on conjecture and speculation." (*People v. Young* (2005) 34 Cal.4th 1149, 1200.)

## II.    Applicable Law

To justify an act of self-defense, the defendant must have an honest and reasonable belief bodily injury is imminent. (See *People v. Minifie* (1996) 13 Cal.4th 1055, 1064; accord, *People v. Perez* (1970) 12 Cal.App.3d 232, 236 [the right of self-defense is based upon the appearance of imminent peril to the person attacked].) Furthermore, the right to self-defense is limited "to the use of such force as is reasonable under the circumstances." (*People v. Minifie*, *supra*, at p. 1065.) "Although the belief in the need to defend must be objectively reasonable, a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge ....' [Citation.] It judges reasonableness 'from the point of view of a reasonable person in the position of defendant ....'" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082–1083.) An inmate has a right of self-defense against an officer only when the inmate is faced with an improper use of force by the officer. (See *People v. Coleman* (1978) 84 Cal.App.3d 1016, 1023; accord, CALCRIM No. 2671 ["If a custodial officer uses unreasonable or excessive force while  (restraining a person … [or] overcoming a person's resistance …), that person may lawfully use reasonable force to defend himself or herself"].)

## III.   Analysis

Defendant contends the court erred in refusing his request for a self-defense instruction because there was evidence the officers used excessive force.  He argues the lack of a self-defense instruction vitiated the jury's findings and prejudiced the verdict, particularly given that the jury acquitted him of count 2, evidencing that they accepted his testimony in part.  The People respond that defendant "failed to show any link between his reasonable belief that he was in imminent danger and his subsequent action to support the instruction."  They further contend that "piecing together selected portions of the

prosecution's case and the defense case does not lead to a reasonable scenario under which [defendant] could claim self-defense." We agree with the People.

The trial court did not err in refusing to give a self-defense instruction because substantial evidence did not support it. (See *People v. Blair* (2005) 36 Cal.4th 686, 744–745, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919 [substantial evidence means "evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist"].) "[B]oth self-defense and defense of others, whether perfect or imperfect, require an actual fear of *imminent* harm." (*People v. Butler* (2009) 46 Cal.4th 847, 868.)

Here, there was no evidence defendant feared imminent harm or was faced with the improper use of force when he kicked Sergeant Gentry. Rather, all the officers testified defendant kicked Sergeant Gentry before any force was used or threatened against defendant. Put differently, while there was evidence the officers used force against defendant and evidence that defendant kicked Officer Gentry, there was no evidence defendant kicked Officer Gentry in response to the use of force. (See *People v. Wilson* (1976) 62 Cal.App.3d 370, 374 ["the jury must conclude that defendant 'was actually in fear of his life or serious bodily injury and that the conduct of the other party was such as to produce that state of mind in a reasonable person'"].) Thus, there was not substantial evidence defendant acted in self-defense.

The cases cited by defendant are inapposite. (See *People v. Elize*, *supra*, 71 Cal.App.4th at pp. 610, 615–616; *People v. Villanueva* (2008) 169 Cal.App.4th 41, 44; *People v. Mayweather* (1968) 259 Cal.App.2d 752, 755–757.) Unlike those cases, here there was no evidence from which the jury could conclude defendant reasonably believed he was in imminent danger of suffering bodily injury when he kicked Sergeant Gentry. (Cf. *People v. Elize*, *supra*, at pp. 610, 615–616 [sufficient evidence to warrant self-defense instruction where there was evidence defendant discharged gun after being physically attacked by women]; *People v. Villanueva*, *supra*, at pp. 44, 50–54 [self-

12.

defense instruction warranted where there was evidence defendant shot at victim after victim accelerated towards defendant in a car in an apparent attempt to run him over]; *People v. Mayweather*, *supra*, at pp. 755–757 [error not to give self-defense instruction where there was evidence defendant and victim were engaged in a physical altercation and the victim was approaching defendant when defendant shot him].)  Rather, in the instant case, the jury would have had to speculate regarding evidence it did not have—evidence that defendant kicked Sergeant Gentry in response to the use or threatened use of excessive force—in order to conclude defendant acted in self-defense.  (See *People v. Perez*, *supra*, 12 Cal.App.3d at p. 236 ["The right to have a jury instructed on self-defense must be based upon more than imagined facts or inferences"]; accord, *People v. Hughes* (2002) 27 Cal.4th 287, 365 [inference based only on speculation is not reasonable].)

Accordingly, the court properly denied defendant's request for a self-defense instruction because substantial evidence did not support it.  (See *People v. Perez*, *supra*, 12 Cal.App.3d at p. 236 [court did not err in refusing to instruct jury on self-defense and possible effect of excessive force by officer where there was no appearance of imminent peril to defendant when he assaulted officer given time interval between alleged use of force by officer and defendant's assault on officer]; *People v. Sedeno* (1974) 10 Cal.3d 703, 718, negative history on other grounds ["It is not error to refuse a request for instructions on self-defense when there is no evidence from which it can be inferred that the defendant feared great bodily harm or death at the hands of the victim"]; accord, CALCRIM No. 3470 [providing a defendant is not guilty, "if (he/she) used force against the other person in lawful (self-defense …)," which requires, in part, that "[t]he defendant reasonably believed that (he/she …) was in imminent danger of suffering bodily injury [or was in imminent danger of being touched unlawfully]"].)

We reject defendant's contention.

13.

**DISPOSITION**

The judgment is affirmed.

PEÑA, J.

WE CONCUR:


FRANSON, Acting P.J.


DeSANTOS, J.